# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LESLIE GRIFFITH,<br><br>                  Plaintiff,<br>v.<br><br>PAUL BARNES, *et al.*,<br><br>                  Defendants. | Case No: 1:06CV01648<br>(HHK) (JMF) |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

**A.  Procedural Background**

1.  Plaintiff filed the instant action on September 25, 2006 against Defendants Paul Barnes ("Barnes"), IREIS, L.L.C. ("IREIS") (collectively, "Defendants") and Defendant Michael J. Brown ("Brown"). Plaintiff's Complaint sought the following: (1) damages based on violations of the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. §§ 1602(aa) & 1639 and 12 C.F.R. § 226, et seq., ("Regulation Z"); (2) damages based on violations of D.C. Code § 28-3301, et seq.; (3) damages based on violation of the District of Columbia's Tenant's Opportunity to Purchase Act ("TOPA"), D.C. Code § 42-3404.1, et seq.; (4) damages based on Defendants' breach of fiduciary and agency duties; (5) damages based on Defendants' fraudulent inducements and misrepresentations in the formation of loan contracts; (6) damages based on Defendants' having induced Ms. Griffith to enter into an unconscionable loan contract; (7) damages based on violations of the District of Columbia's Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 et seq.; (8) damages based on Defendants' and Brown's fraudulent conveyance

of Ms. Griffith's home; (9) damages based on the theory of unjust enrichment; and (10) damages based on Defendants' breach of their contract with Ms. Griffith.

2. On March 16, 2007, Plaintiff's claims against Brown were dismissed pursuant to the terms of a settlement between Plaintiff and Brown.

3. On February 29, 2008, the Court entered a default judgment against Defendants. As a result of the entry of judgment, all of the well-pled allegations in Plaintiff's Complaint are deemed admitted by Defendants. On April 10, 2008, Plaintiff filed a *Motion for Damages Award in Connection with Default Judgment Entered on February 29, 2008*. Plaintiff sought disgorgement and statutory damages in the amount of $240,574, prejudgment interest calculated at $35,020 as of April 10, 2008, punitive damages in an amount to be determined by the Court, and injunctive relief barring such future practices by Defendant Barnes, Defendant IREIS, and any other companies formed by or associated with Defendants.

4. The Court held a hearing on damages on April 15, 2008. During that hearing, the Court heard expert testimony with respect to the calculation of damages.

**B.  Factual Background**

　　**i.  Liability**

5. Plaintiff is an adult citizen of the District of Columbia who, upon commencement of this action, resided in a single family home which she inherited from her mother in 2001. Ms. Griffith's home (the "Residence") is located at 2619 Newton Street, N.E., Washington, D.C. 20018. (Compl. ¶¶ 10, 14).

2

6. Barnes is an adult citizen of the State of Maryland. He resides at 12512 Woodsong Lane, Bowie, Maryland 20721. Defendant Barnes was the Resident Agent of IREIS, in the State of Maryland prior to the company's dissolution. (Compl. ¶ 13).

7. IREIS is a limited liability company that was formed under the laws of the State of Maryland. IREIS' principal place of business was located at 12512 Woodsong Lane, Bowie, Maryland, 20721. According to its Articles of Organization, IREIS was a company formed, in pertinent part, to "Buy, rehabilitate, own, and manage real estate property; to hold, acquire, invest, mortgage, lease and convey real and personal property in any part of the world, so far as necessary or expedient in conducting the business of the company; to engage in any and all business related to the real estate business." (Compl. ¶ 11). The company voluntarily was dissolved by Barnes on July 27, 2007. (Abrams Affidavit, Ex. 1 to Notice of Submission, ¶3).

8. In March of 2004, Ms. Griffith took a mortgage on the Residence for $95,000 and paid off an earlier mortgage on the property. By September of 2004, Ms. Griffith had fallen behind in her mortgage payments and was searching for ways to solve this problem. (Compl. ¶¶ 15-16).

9. In early September 2004, Kelly Profit, a friend of Ms. Griffith's, informed Ms. Griffith that Barnes could help her keep the Residence and offered to put Ms. Griffith in contact with Barnes. (Compl. ¶ 17). Ms. Griffith spoke to Barnes via telephone shortly thereafter in September 2004. During the call, Barnes pressured Ms. Griffith to meet with him immediately saying that it was imperative because the bank could foreclose at any time and that Barnes would not be able to help her after the bank started proceedings. Ms. Griffith met Barnes at the Residence, on September 20, 2004, less than a week after that telephone call. (Compl. ¶ 18).

3

10. During this meeting, Barnes told Ms. Griffith that his company, IREIS, was formed by a group of real estate investors and that the type of arrangement he was offering her was standard for their business. He informed Ms. Griffith that she was a credit risk because she was unemployed, but that he and his company wanted to help her out. (Compl. ¶ 19).

11. Barnes offered Ms. Griffith a loan that he said was standard for his business with the following terms: (1) Barnes and/or IREIS would pay off Ms. Griffith's $95,000 mortgage and in return give Ms. Griffith $25,000; (2) Ms. Griffith would pay Barnes and/or his company IREIS $850 a month for a period of two years; (3) at any time during the two years, Ms. Griffith had the right to repurchase the Residence for $170,000; (4) at any time during the two years, Ms. Griffith had the right to accept a lump sum payment of $35,000 to terminate the contract and "sell" the Residence to Barnes and/or IREIS; and (5) Barnes and/or IREIS was responsible for the upkeep of the property, including utilities. (Compl. ¶ 20).

12. During the meeting on September 20, 2004, Barnes induced Ms. Griffith to sign a number of documents in order to obtain the loan. These documents included: (1) an agreement which set forth the terms of the loan agreement described above (the "Agreement"); (2) an "Agreement to Sell Real Estate"; and (3) an "Authorization to Release Information/Limited Power of Attorney" ("Limited Power of Attorney"). (Compl. ¶ 22).

13. The Agreement had an effective interest rate in excess of the maximum 24% per annum interest rate permitted by law in the District of Columbia. This fact was never disclosed to Ms. Griffith. (Compl. ¶ 21).

14. Ms. Griffith received no disclosure documents related to the loan; nor did she receive a copy of the appraiser's report on the Residence subsequently obtained by Barnes. (Compl. ¶ 21).

15. Barnes explained to Ms. Griffith that the purpose of the "Agreement to Sell Real Estate" was to transfer title of the Residence to IREIS, which would hold it in trust for two years or until she repurchased the Residence pursuant to the terms of their Agreement. (Compl. ¶ 23).

16. Barnes also told Ms. Griffith that the Limited Power of Attorney was necessary to make the loan and pay off the existing mortgage. When Ms. Griffith questioned whether the Limited Power of Attorney would be in effect until she repurchased the Residence in two years, Barnes stated that it would only be in effect until title of the Residence was transferred to IREIS to be held in trust and Ms. Griffith had received the $25,000. (Compl. ¶ 24).

17. The Limited Power of Attorney form which Barnes induced Ms. Griffith to sign on September 20, 2004, lacked the basic formalities for such a document in the District of Columbia as well as incorrectly listed Ms. Griffith's home address. Consequently, Barnes induced Ms. Griffith to sign a "Special Power of Attorney" on December 21, 2004. (Compl. ¶ 25).

18. Barnes gave Ms. Griffith a check for $25,000 on January 15, 2005. (Compl. ¶ 29).

19. On March 9 or 10, 2005, Ms. Griffith and Barnes met to discuss the Agreement. During this meeting, Barnes told Ms. Griffith that changes had to be made to the Agreement setting forth the terms of their arrangement; and requested she provide him with the original Agreement document. Barnes was to return the Agreement during a scheduled meeting with Ms.

5

Griffith on or about March 29, 2005. Barnes cancelled that meeting and never returned the Agreement. (Compl. ¶ 30).

20.  Ms. Griffith made the required payments of $850 to Barnes and/or IREIS in February 2005 and March 2005. (Compl. ¶ 31).

21.  Ms. Griffith called Barnes to discuss taking the option of accepting the $35,000 payout in May 2005 because she found herself unable to make the required monthly payments. She was unable to reach Barnes in person, but left a message with his secretary, during the third week of May, asking Barnes to call her. The following week, she left a message on his cell phone stating that she wanted to discuss taking the payout. Barnes never responded to these messages. (Compl. ¶ 32).

22.  On December 28, 2004, without Ms. Griffith's knowledge or consent, Barnes, holding himself out as "Leslie Griffith's attorney-in-fact" executed a deed transferring title to Ms. Griffith's home to Brown, not IREIS, as he had represented to Ms. Griffith. (The December 28, 2004 sale to Brown is hereinafter referred to as the "2004 Sale".) Brown formerly worked with Barnes on real estate related matters. Ms. Griffith never met Brown. (Compl. ¶¶ 26-27).

23.  The deed evidencing the transfer of the Residence to Brown pursuant to the 2004 Sale recites that $250,000 was paid for the property. However, above and beyond the initial payment of $25,000 and the payoff of her mortgage, Ms. Griffith did not receive any money or compensation in relation to the secret sale of the Residence. (Compl. ¶ 26).

24. Ms. Griffith was never given a HUD-1 in relation to the "sale" of the Residence nor was Ms. Griffith informed of, or invited to participate in, the closing held with respect to the sale of the Residence. (Compl. ¶ 28).

25. On November 4, 2005, title to Ms. Griffith's home was transferred from Brown to Pamela S. Davis ("Davis"). (The November 4, 2005 sale to Davis is hereinafter referred to as the "2005 Sale".) The deed evidencing the transfer of the Griffith home to Pamela Davis pursuant to the 2005 Sale recites that $380,000 was paid for the property. (Compl. ¶ 37).

**ii.   Damages**

26. During the hearing on damages held on April 15, 2008, the court accepted Gregory E. Smith ("Smith"), a Certified Public Accountant and Director at LECG, an economic and financial consulting firm, as an expert in economic and financial matters and permitted him to give expert testimony regarding the calculation of damages. (Damages Hrg. Transcript at pp. 5-10). The expert report prepared by Smith was admitted into evidence. (Damages Hrg. Transcript at p. 10, line 25 - p. 11, line 2).

27. The net sales price of the Residence for the 2004 Sale was $242,500 taking into account a credit to Brown, the buyer, and seller's help amounting totaling $7,500. (Damages Hrg. Transcript at p. 12, lines 2-7; Expert Report, Ex. 2). The proceeds from the sale were used to pay approximately $98,000 for Plaintiff's existing mortgage, closing costs, taxes, a home warranty, and water charges. Accordingly, the net proceeds from the 2004 Sale were $140,147. (Damages Hrg. Transcript at p. 12, lines 8-15; Expert Report, Ex. 2).

28. The net sales price of the Residence for the 2005 Sale was $371,729 taking into account seller's help and taxes paid by the seller. (Damages Hrg. Transcript at p. 12, lines 17-19;

7

Expert Report, Ex. 2). The proceeds from the sale were used to pay off the two mortgages taken on the Residence in connection with the December 24, 2004 sale, closing costs, taxes, water charges and escrow. Accordingly, the net proceeds from the 2005 Sale were $125,427. (Damages Hrg. Transcript at p. 12, lines 20-25; Expert Report, Ex. 2).

29. The net proceeds from both sales totaled $265,574. After subtracting the $25,000 received by Plaintiff in January of 2005, the benefit to Defendants was $240,574. (Damages Hrg. Transcript at p. 13, lines 1-4; Expert Report, Ex. 2).

30. Prejudgment interest, accruing at a rate of 6%, to be $36,953 as of May 28, 2008 (Smith Affidavit, Ex. 3 to Notice of Submission, ¶5), and prejudgment interest, accruing at a rate of 6%, to be $37,505 as of June 11, 2008. (*Id.*).

31. The finance charge related to the Agreement totaled $67,311. The finance charge was determined by subtracting the total loan amount from the total cost of the loan. The total loan amount under the Agreement was $123,089 which included the $98,089 to pay off Ms. Griffith's loan and the $25,000 paid to Ms. Griffith in connection with the loan. The total cost of the loan was $190,400 which included $850 per month for 24 months for a total of $20,400 and $170,000 to be paid at the end of the loan term to reassume possession of the Residence. The difference between the two is $67,311. (Damages Hrg. Transcript at p. 16, line 17-p. 17, line 2; Expert Report, Ex.1).

## CONCLUSIONS OF LAW

32. By virtue of the Default Judgment entered on February 29, 2008, Plaintiff has prevailed on the merits of all of the well-pled allegations in her complaint. "A defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Adkins v. Teseo,*

8

180 F. Supp. 2d 15, 17 (D.D.C. 2001); *see also Carpenters Labor-Mgmt. Pension Fund v. Freeman-Carder LLC*, 498 F. Supp. 2d 237, 241 (D.D.C. 2007); *Oliver v. Mustafa*, 929 A.2d 873, 878 (D.C. 2007).

33.     It is well established that, when a plaintiff may recover under more than one theory of an action, the plaintiff may choose which of the alternative remedies she wishes to pursue. *See Amber Res. Co. v. United States*, 73 Fed. Cl. 738, 748 (Fed. Cl. 2006) (court recognized plaintiff's right to choose between restitution and reliance damages); *see also DeLima v. Bidwell*, 182 U.S. 1, 180 (1901). Plaintiff's Complaint sets forth ten causes of action, and Defendants have been deemed to have admitted liability to each of those causes of action. Exercising her right to choose which remedy to pursue, Plaintiff has elected to seek damages in the form of disgorgement pursuant to her Ninth Cause of Action, unjust enrichment and overlapping statutory damages for violations of TILA and HOEPA, which she seeks to have subsumed within the disgorgement damages amount.

34.     Although there are other claims in addition to unjust enrichment and/or the statutory claims for which Plaintiff could recover, Plaintiff has requested disgorgement and statutory damages only. In addition, as discussed below, Plaintiff seeks prejudgment interest on the amount by which Defendants were unjustly enriched to commence on the day after the 2005 Sale, November 5, 2005. Plaintiff further seeks punitive damages and injunctive relief barring such future real estate related practices by Defendants.

A.     <u>Unjust Enrichment/ Disgorgement</u>

37.     Under District of Columbia law, which governs Plaintiff's common law claims, "[u]njust enrichment occurs when a person retains a benefit (usually money) which in justice and

equity belongs to another. In such a case, the recipient of the benefit has a duty to make restitution to the other person 'if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [the recipient] to retain it.'" *4934, Inc. v. D.C. Dep't of Employment Servs.*, 605 A.2d 50, 55-56 (D.C. 1990) (citation omitted); *see also Ererine v. Yancey*, 680 A.2d 1380, 1383 (D.C. 1996). The District of Columbia Court of Appeals held that the "[r]emedy of disgorgement, much like that of a constructive trust, is meant 'to provide just compensation for the wrong, not to impose a penalty'; it is given in accordance with the principles governing equity jurisdiction, not to inflict punishment but to prevent an unjust enrichment." *In re Estate of Corriea*, 719 A.2d 1234, 1240 (D.C. 1998) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940)); *see also SEC v. Bilzerian*, 814 F. Supp. 116 (D.D.C. 1993) ("The primary purpose of disgorgement is not to punish the wrongdoer but rather to prevent the unjust enrichment of the wrongdoer by depriving him of ill-gotten gains").

38. Accordingly, disgorgement is an appropriate remedy to prevent Defendants' unjust enrichment at Plaintiff's expense. As Defendants have been found liable for the unlawful taking of Plaintiff's home and for profiting from two subsequent illegal transfers of the property, Defendants should be denied any profit or unjust enrichment from their actions.

39. In determining the amount of the disgorgement, courts have stated that, because the purpose of disgorgement is remedial, not punitive, "a court's equitable power is restricted to 'property causally related to the wrongdoing.'" *United States v. Philip Morris U.S.A.*, 310 F. Supp. 2d 58, 63-64 (D.D.C. 2004) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. 1989) and adopting, by analysis, the rationale for disgorgement in securities actions to other situations). The D.C. Circuit noted that "[t]he requirement of a causal relationship between

10

a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act; rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617, 341 U.S.App.D.C. 175, 190 (D.C. 2000). Accordingly, even in cases where it is difficult to distinguish between legal and illegal profits, courts have held that actual profits are appropriate to use when calculating disgorgement. *See United States v. Philip Morris U.S.A., Inc.*, 396 F.3d 1190, 1228, 364 U.S. App. D.C. 454, 492 (D.C. 2005) (noting that in *First City Fin. Corp.*, "'the government's showing of appellants' actual profits on the tainted transactions at least presumptively satisfied' its 'burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment.'"). Furthermore, the D.C. Circuit stated that, in circumstances where the amount of disgorgement is not clear, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *First City Fin. Corp.*, 890 F.2d at 1232.

40.   Defendants' unjust enrichment is equal to the total profit obtained from the 2004 and 2005 Sales of the Residence minus the $25,000 paid to Plaintiff pursuant to the terms of the Agreement. Accordingly, Plaintiff is entitled to $240,574 in disgorgement damages. *See* Findings of Fact Nos. 27-29.

**B.   Prejudgment Interest on Disgorgement/Unjust Enrichment**

41.   Plaintiff seeks prejudgment interest, which is appropriate in this case. Unjust enrichment sounds in tort. *See Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996). "In an action sounding in tort, District of Columbia law permits the award of prejudgment interest 'to the extent that it will make the injured party whole.'" *BCCI Holdings*

11

*(Luxembourg) Societe Anonyme v. Khalil*, 56 F. Supp. 2d 14, 67 (D.D.C. 1999), *rev'd on other grounds*, 214 F.3d 168 (D.C. Cir. 2000). In the tort actions, like in securities actions, "[d]isgorgement rightly includes prejudgment interest to enable the [recovery of] the full amount of the defendants' unjust enrichment and to provide the possibility of complete compensation to the defrauded investors; to preclude defendants from enjoying an interest-free loan on their illicitly-obtained gains, the court requires them to pay interest on the amounts they disgorge." *SEC v. Levine*, 517 F. Supp. 2d 121, 141 (D.D.C. 2007) (citation omitted).

42. The determination of whether to "award prejudgment interest is committed to the sound discretion of the court." *BCCI Holdings*, 56 F. Supp. 2d at 68. The Supreme Court, holding that "prejudgment interest traditionally has been considered part of the compensation due plaintiff," has set forth five considerations to guide the court in this determination. *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989). In *BCCI Holdings*, the court summarized these considerations as follows:

> [1] whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries; [2] the degree of personal wrongdoing on the part of the defendant; [3] the availability of ... investment opportunities to the plaintiff; [4] whether the plaintiff delayed in bringing or prosecuting the action; and [5] other fundamental considerations of fairness.

*BCCI Holdings*, 56 F. Supp. 2d at 68 (internal citations omitted).

43. Applying these considerations to Plaintiff's case, it is clear that prejudgment interest is appropriate. First, disgorgement of the profits Defendants made as a result of the two transfers of Plaintiff's home does not fully compensate Plaintiff for her loss. Since the November 2005 Sale, Plaintiff has been deprived of the time value of her property. Prejudgment interest is the only equitable means of compensating her for this loss.

> [I]n awarding prejudgment interest to plaintiffs, courts have observed that the 'interest compensates for the time value of money and thus is often necessary for full compensation.' ... Such compensation is particularly appropriate here, when an award is intended to compensate for injuries sustained over the course of [an extended period].

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 264 (D.D.C. 2008) (citation omitted).

44. Second, as to the questions of Defendants' level of personal wrongdoing, there is no question that only Defendants were at fault in this action. Plaintiff was in a vulnerable state as she faced the possible loss of the Residence through foreclosure. Defendants preyed on that vulnerability and her relative lack of sophistication in order to steal the Residence and rob her of the equity in it.

45. With regard to the third consideration, the fact that the Residence sold for $380,000 in November of 2005 indicates that Plaintiff would have been able to sell the home for a significant amount and invest the proceeds of such a sale.

46. Fourth, Plaintiff did not delay in filing suit. As soon as she became aware of Defendants' actions when Defendants sought to evict her from the Residence, Plaintiff sought counsel to assist her in this action. Thus, the fourth consideration also weighs in favor of granting Plaintiff prejudgment interest.

47. Finally, as the *BCCI Holdings* court summarized, it is only "fair to treat the defendant as plaintiff's banker, with the plaintiff's damages having been on deposit with the defendant from the time plaintiff's claim accrued." *BCCI Holdings*, 56 F. Supp. 2d at 68.

48.  "Prejudgment interest is an element of complete compensation to a creditor for the loss of use of money that a debtor wrongfully withholds." *Dist. Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714, 732 (D.C. 2003) (citation omitted). The important question in determining whether a party is entitled to prejudgment interest, therefore, is "whether the plaintiff has been deprived of the use of the money withheld and should be compensated for the loss." *District of Columbia v. Pierce Assocs., Inc.*, 527 A.2d 306, 311 (D.C. 1987). Plaintiff clearly has been deprived of the time value of her property and deserves to be compensated for that loss. Accordingly, an award of prejudgment interest is appropriate.

49.  In *Dist. Cablevision*, a CPPA case, the District of Columbia Court of Appeals upheld an award of prejudgment interest pursuant to D.C. CODE § 15-108. In the absence of an expressed contractual provision, the statutory limit on prejudgment interest applies to liquidated debts. *See Pierce*, 527 A. 2d at 306-308. D.C. CODE § 28-3302(a) states: "The rate of interest in the District upon the loan or forbearance of money, goods, or things in action in the absence of an expressed contract is 6% per annum."

50.  Accordingly, prejudgment interest shall be calculated at the rate of 6% per annum from November 5, 2005.

51.  Plaintiff is entitled to prejudgment interest of $[to be added by the Court based on date of entry of judgment]. *See* Findings of Fact No. 30.

C.  <u>Overlapping Statutory Damages Relative to the TILA and HOEPA Claims</u>

52.  The damages provisions for TILA and HOEPA provide, in pertinent part,

> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under

14

> this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of
>
> ...
>
> (2)(A) (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000;
>
> ...
>
> (4) in the case of a failure to comply with any requirement under section 1639 of this title, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material.

15 U.S.C.A. §§ 1640(a)(2)(A)(iii) & 1640(a)(4). Section 1640(a)(2)(A)(iii) refers to violations of TILA and Section 1640(4) specifically refers to the HOEPA violation.

53.  Defendants, through default, have admitted liability for the TILA and HOEPA violations as adequately pled in Plaintiff's complaint. As such, statutory damages in the amount of $2,000 are appropriate for the TILA violation and $67,311 are appropriate for the HOEPA violation as the sum of all finance charges and fees. Accordingly, Plaintiff is entitled to $69,311 in statutory damages. *See* Findings of Fact No. 31. Because recovery of these statutory damages would be duplicative of the damages for the unjust enrichment claim, the statutory damages shall be awarded; but they shall be subsumed within the disgorgement damages.

D.  **Punitive Damages**

54.  D.C. CODE § 28-3905(k) provides for the award of punitive damages for violations of the CPPA. In another foreclosure savior scam perpetrated in the District of Columbia, the Court of Appeals held,

> Defendant's malicious conduct in gaining the confidence of homeowner, a frail, elderly, and vulnerable widow, by falsely advertising, in violation of Consumer Protection

15

>Procedures Act (CPPA), his foreclosure-avoidance services and thereby enabling defendant to gain her trust by a promise to save her home, after which he orchestrated a scheme to gain title to the home for a fraction of its value, warranted an award of punitive damages to homeowner's estate, separate from award of treble damages under CPPA.

*Byrd v. Jackson*, 902 A.2d 778 (D.C. 2006). Likewise, punitive damages are warranted for Defendants' violation of the CPPA in pursuit of their similar foreclosure savior scam.

55. Under the law of the District of Columbia, "[p]unitive damages are available for intentional torts ...." *Oliver v. Mustafa*, 929 A.2d 873, 878 (D.C. 2007). A court may award punitive damages when "it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." *Chatman v. Lawlor*, 831 A.2d 395, 400 (D.C. 2003).

56. Defendants have admitted liability for fraud, unconscionability, fraudulent conveyance, and unjust enrichment. While a finding of fraud is not alone sufficient to warrant punitive damages, the *Chatman* Court found that defendants who preyed on vulnerable persons and "willingly engaged in a fraudulent transaction ... that prolonged their financial distress," were guilty of "outrageous conduct such as maliciousness, wantonness, gross fraud, recklessness and willful disregard of another's rights" needed for an award of punitive damages. *See id.*

57. In this time of turmoil in the mortgage industry, the actions of Defendants, preying on vulnerable distressed homeowners such as Plaintiff, warrant the sanction of punitive damages in an amount to be determined by the Court. The determination of the amount of punitive damages is properly left to the Court's discretion in this action. *See Robinson*, 535 A.2d at 907 (noting that in jury trials, "the amount of punitive damages is left to the jury's discretion.");

*see also Washington Med. Ctr., Inc. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990) (noting that in bench trials, the "punitive damages [award] is left to ... the discretion of the trial court.").

58.     The Court awards punitive damages in the amount of $[to be added by the Court].

### E.     Injunctive Relief

59.     Finally, Plaintiff is seeking injunctive relief barring such future real estate related practices by Defendants. The stated purposes of CPPA are to "assure that a just mechanism exists to remedy all improper trade practices; [and] promote, through effective enforcement, fair business practices throughout the community." D.C. CODE § 28-3901(b)(2). Defendants' actions clearly violate the stated purposes of this action and the penalty provision of CPPA allows for injunctions "against the use of the unlawful trade practice." D.C. CODE §28-3905(k)(1)(D); *see also Johnson v. Long Beach Mortg. Loan Trust 2001-4*, 451 F. Supp. 2d 16, 38 (D.D.C. 2006).

60.     Accordingly, the Court shall issue an injunction barring such future real estate related practices by Defendants as appropriate. Specifically, Defendants shall be prohibited from: (a) the making of any residential real estate related loans or mortgages not related to Defendant Barnes' primary residence; (b) facilitating, in any manner, the transfer of any residential real estate not otherwise owned by Defendant Barnes; or (c) representing to any individual that Defendants can assist in resolving or otherwise addressing any residential real estate mortgage related debt or delinquency issue.

## CONCLUSION

Accepting the well-pled fact of Plaintiff's Complaint and for the reasons set forth above, the Court orders as follows: (1) disgorgement and statutory damages in the amount of

$240,574 shall be awarded to Plaintiff; (2) prejudgment interest calculated at 6% per annum, totaling [$36,953 as of May 28, 2008 or $37,505 as of June 11, 2008] shall be awarded to Plaintiff; (3) punitive damages in the amount of $[to be determined by the Court] shall be awarded to Plaintiff; and (4) an injunction shall be entered barring Defendant Paul Barnes, Defendant IREIS, LLC, and any other companies formed by or associated with Defendant Paul Barnes or Defendant IREIS, LLC, from engaging in any of the following practices: (a) making or inducing or arranging for others to make any residential real estate related loan or mortgage; (b) facilitating or inducing or arranging for others to facilitate the transfer of any residential real estate not otherwise owned by Defendants; or (c) representing or purporting to represent to any individual that Defendants can assist said individual in resolving or otherwise addressing any residential real estate mortgage related debt or delinquency issue.

                                                                  The Honorable Judge Henry H. Kennedy
                                                                  United States District Judge

Dated: _____, 2008
        Washington, DC