UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LESLIE GRIFFITH,<br><br>             Plaintiff,<br><br>     v.<br><br>PAUL BARNES, et al.,<br><br>             Defendants. | Civil Action 06-01648 (HHK) |

**MEMORANDUM**

In this action, Plaintiff Leslie Griffith ("Griffith") asserts that Paul Barnes ("Barnes"), IREIS, L.L.C. ("IREIS"), and Michael J. Brown ("Brown") (collectively "Defendants") engaged in a predatory loan scheme whereby they fraudulently took title to Griffith's house and re-sold it without her knowledge. On June 13, 2007, Griffith's claims against Brown were dismissed pursuant to a settlement. On February 28, 2008, this court entered a default against Barnes and IREIS.[1] *See* Fed. R. Civ. P. 55(a) (authorizing entry of defaults). As a result of the entry of default, all of the well-pleaded allegations in Griffith's complaint are deemed admitted by Barnes and IREIS. *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001). Griffith now seeks entry of default judgment pursuant to Fed. R. Civ. P. 55(b).

---

[1] On January 10, 2008, this case was called for a status conference. Counsel for Griffith appeared, but Barnes and IREIS did not appear. On January 16, 2008, Barnes and IREIS were ordered to show cause by no later than February 8, 2008, why they should not be sanctioned for their failure to appear and/or why a default should not be entered in this action. They failed to show cause. Furthermore, as set forth in Griffith's Motion for Default Judgment Against Defendant Barnes and Defendant IREIS, L.L.C. [#57], Barnes and IREIS have engaged in numerous dilatory tactics.

1

The court held a hearing on damages on April 15, 2008, during which the court heard expert testimony with respect to the calculation of damages.[2] Based upon the evidence presented at that hearing and the well-pleaded allegations of the complaint, the court makes the following:

### I. FINDINGS OF FACT

1. Griffith is an adult citizen of the District of Columbia who, upon commencement of this action, resided in a single family home that she inherited from her mother in 2001. Griffith's house (the "Residence") is located at 2619 Newton Street, N.E., Washington, D.C. 20018.

2. Barnes is an adult citizen of the state of Maryland. He resides at 12512 Woodsong Lane, Bowie, Maryland 20721. Barnes was the Resident Agent of IREIS, in the state of Maryland prior to the company's dissolution.

3. IREIS is a limited liability company that was formed under the laws of the state of Maryland. IREIS' principal place of business was located at 12512 Woodsong Lane, Bowie, Maryland 20721. According to its Articles of Organization, IREIS was a company formed, in part, to "buy, rehabilitate, own, and manage real estate property; to hold, acquire, invest, mortgage, lease and convey real and personal property in any part of the world, so far as necessary or expedient in conducting the business of the company; to

---

[2] Gregory E. Smith ("Smith"), a Certified Public Accountant and Director at LECG, an economic and financial consulting firm, was permitted to give expert testimony pertinent to economic and financial matters and his expert report regarding the calculation of damages was admitted into evidence.

        engage in any and all business related to the real estate business." The company was voluntarily dissolved by Barnes on July 27, 2007.

4. At all relevant times, Barnes was the organizer and agent of IREIS and exercised dominion and control over IREIS. Barnes and IREIS held themselves out as professionals and persons or entities willing to assist individuals facing foreclosure to maintain ownership of their homes.

5. In March 2004, Griffith took out a mortgage on the Residence for $95,000 and paid off an earlier mortgage on the Residence. By September 2004, Griffith had fallen behind in her mortgage payment.

6. In September 2004, Kelly Profit, a friend of Griffith's, told Griffith that Barnes could help Griffith keep the Residence and offered to put Griffith in contact with Barnes. Griffith spoke to Barnes by telephone in September 2004.

7. During the telephone call, Barnes pressured Griffith to meet with him immediately, saying that it was imperative because the bank could foreclose at any time and that Barnes would not be able to help her after the bank started foreclosure proceedings. Griffith met Barnes at the Residence on September 20, 2004.

8. During the September 20, 2004, meeting Barnes told Griffith that she was a credit risk because she was unemployed, but that he and his company wanted to help her out.

9. Barnes offered Griffith a loan that he said was standard for his business. The terms of the loan were as follows: (1) Barnes and/or IREIS would pay off Griffith's $95,000 mortgage and in return give Griffith $25,000; (2) Griffith would pay Barnes and/or IREIS $850/month for two years; (3) at any time during the two years, Griffith had the right to repurchase the Residence for $170,000; (4) at any time during the two years, Griffith had the right to accept a lump sum payment of $35,000 to terminate the contract and "sell" the Residence to Barnes and/or IREIS; and (5) Barnes and/or IREIS were responsible for the upkeep of the property, including utilities.

10. During the September 20, 2004, meeting, Barnes induced Griffith to sign a number of documents to obtain the loan. These documents included: (1) an agreement setting forth the terms of the loan agreement as described *supra* ("the Agreement"); (2) an "Agreement to Sell Real Estate"; and (3) an "Authorization to Release Information/Limited Power of Attorney."

11. The Agreement had an effective interest rate in excess of the maximum 24% per annum rate permitted by law in the District of Columbia. This fact was never disclosed to Griffith. Griffith received no disclosure documents related to the loan nor a copy of the appraiser's report subsequently obtained by Barnes.

12. Barnes explained to Griffith that the purpose of the "Agreement to Sell Real Estate" was to transfer title of the Residence to IREIS, which would hold it in trust for two years or until Griffith repurchased the Residence.

13. Barnes also told Griffith that the "Authorization to Release Information/Limited Power of Attorney" was necessary to make the loan and pay off the existing mortgage. When Griffith questioned whether the Limited Power of Attorney would be in effect until she repurchased the Residence in two years, Barnes stated that it would only be in effect until title of the Residence was transferred to IREIS to be held in trust and Griffith received the $25,000.

14. The Limited Power of Attorney form that Griffith signed on September 20, 2004, lacked basic formalities for such a document as required in the District of Columbia and incorrectly listed Griffith's home address. Accordingly, Barnes induced Griffith to sign a "Special Power of Attorney" form on December 21, 2004.

15. Barnes gave Griffith a check for $25,000 on January 15, 2005.

16. On or about March 9, 2005, or March 10, 2005, Griffith and Barnes met to discuss the Agreement. Barnes told Griffith that changes needed to be made, and Barnes requested that she provide him with the original Agreement document. Griffith provided the document to Barnes. Barnes was to return the Agreement during a meeting with Griffith on or about March 29, 2005. Barnes cancelled that meeting and never returned the original copy of the Agreement. Accordingly, Griffith does not have a copy of the Agreement.

17. Griffith made the required payments of $850/month in February 2005 and March 2005.

18.   In May 2005, Griffith called Barnes to discuss the possibility of accepting the $35,000 payout because she was unable to make the required monthly payments. She was unable to reach Barnes in person, but left a message with his secretary during the third week of May asking Barnes to call her. The following week, Griffith left a message on Barnes' cell phone telling Barnes that she wanted to discuss the possibility of taking the payout. Barnes never responded to these messages.

19.   On December 28, 2004, without Griffith's knowledge or consent, Barnes held himself out as "Leslie Griffith's attorney-in-fact" and engaged in a secret sale of the Residence ("2004 Sale"). Barnes executed a deed transferring title to the Residence to Brown, even though Barnes had told Griffith that the deed would be transferred to IREIS. Griffith was never informed of, or invited to participate in, the closing with respect to the Residence.

20.   The deed evincing the transfer of the Residence to Brown recites that $250,000 was paid for the Residence. After taking into account a credit to Brown and seller's help amounting to $7,500, the net sales price was $242,500. The proceeds from this sale were used to pay off Griffith's existing mortgage of $98,089,[3] closing costs, taxes, a home warranty, and water charges. After taking these expenses into account, the net proceeds from the 2004 Sale consisted of $140,147.

21.   On November 4, 2005, title to the Residence was then transferred to Pamela S. Davis ("2005 Sale").

---

[3] Although the mortgage was for $95,000, the total amount paid off in December 2004 was $98,089.

22. The deed evincing the transfer of the Residence to Davis recites that $380,000 was paid for the property in the 2005 Sale. After taking into account seller's help and taxes paid by the seller, the net sales price was $371,729. The proceeds from this sale were used to pay off two mortgages that were taken out on the Residence in connection with the 2004 Sale, as well as closing costs, taxes, water charges, and escrow. Accordingly, the net proceeds from the 2005 Sale consisted of $125,427.

23. Griffith did not receive any money or compensation in connection with these two sales. The only compensation received by Griffith consisted of the: (1) $25,000 payment and (2) payoff of the $95,000 mortgage. Defendants retained for themselves the proceeds of the sales of the Residence.

24. The net proceeds from the 2004 and 2005 sales total $265,574. After subtracting the $25,000 received by Griffith, the net proceeds total $240,574.

25. Prejudgment interest on the total proceeds, accruing at a rate of 6% from November 5, 2005,[4] through June 11, 2008, totals $37,505.

## II. CONCLUSIONS OF LAW

26. By virtue of the default entered on February 28, 2008, Griffith has prevailed on the merits of all of the well-pleaded allegations in her complaint. *Adkins*, 180 F. Supp. 2d at 17; *see also Carpenters Labor-Mgt. Pension Fund v. Freeman-Carder LLC*, 498 F. Supp. 2d

---

[4] November 5, 2005 is the day after the 2005 Sale.

237, 241 (D.D.C. 2007). While default establishes the defaulting party's liability for the well-pleaded allegations of the complaint, the court is required to make an independent determination of the sum to be awarded as damages. *Adkins*, 180 F. Supp. 2d at 17; *Freeman-Carder LLC*, 498 F. Supp. 2d at 240. The court has "considerable latitude in determining the amount of damages." *Freeman-Carder LLC*, 498 F. Supp. 2d at 240.

27. Griffith's complaint listed nine separate causes of action, but Griffith has chosen to seek damages solely pursuant to the following causes of action: (1) unjust enrichment; (2) the Federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* and the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. §§ 1602(aa), 1639; and (3) the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*[5] Griffith also seeks prejudgment interest, punitive damages, and injunctive relief.

### A. Unjust Enrichment and Disgorgement

28. Griffith's claim for unjust enrichment is governed by District of Columbia law. Unjust enrichment occurs "when a person retains a benefit (usually money) which in justice and equity belongs to another. In such a case, the recipient of the benefit has a duty to make restitution to the other person if . . . it is unjust for [the recipient] to retain it." *4934 Inc. v. D.C. Dep't of Employment Servs.*, 605 A.2d 50, 55-56 (D.C. 1992) (internal citations

---

[5] In her motion for damages, Griffith states that she seeks damages solely pursuant to her claims for unjust enrichment and violations of TILA and HOEPA. Yet, Griffith later asserts that she seeks punitive damages pursuant to CPPA. Because of her request for punitive damages pursuant to CPPA, the court has included the CPPA in the list of the causes of actions pursuant to which Griffith seeks damages.

and quotations omitted). For defendants to be liable for unjust enrichment, their actions must be "unjust," that is to say, they must have committed some "wrongful act." *News World Comms., Inc. v. Thompsen*, 878 A.2d 1218, 1225 (D.C. 2005) (internal quotations omitted).

29. Defendants' sales of the Residence without Griffith's knowledge or consent and retention of the proceeds from the sales was wrongful. By retaining these proceeds, defendants were unjustly enriched.

30. When there is unjust enrichment, disgorgement is an appropriate remedy. Disgorgement, like "a constructive trust, is meant 'to provide just compensation for the wrong, not to impose a penalty'; it is given in accordance with the principles governing equity jurisdiction, not to inflict punishment but to prevent an unjust enrichment." *In re Estate of Corriea*, 719 A.2d 1234, 1240 (D.C. 1998) (*quoting Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940)); *see also United States v. Philip Morris*, 310 F. Supp. 2d 58, 63 (D.D.C. 2004) ("Disgorgement of ill-gotten gains is . . . remedial, serving to deprive a wrongdoer of unjust enrichment.").

31. Disgorgement is an appropriate remedy here. Defendants should not be permitted to retain the benefits derived from selling the Residence without Griffith's knowledge or consent.

32. Because the purpose of disgorgement is remedial, rather than punitive, "a court's equitable power is restricted to property causally related to the wrongdoing." *Philip

*Morris*, 310 F. Supp. 2d at 64 (internal quotations omitted). Therefore, the court must distinguish between illegally and legally obtained profits. *S.E.C. v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Griffith has the burden of demonstrating that the proposed disgorgement figure reasonably approximates the amount of illegally obtained profits. *Id.* at 1232. The court concludes that Griffith has met this burden by calculating the amount of actual profits earned on the sales of the Residence. *Id.* (concluding that plaintiff presumptively satisfied her burden by calculating the amount of actual profits).[6]

33. The court concludes that the amount by which defendants have been unjustly enriched is equal to the total proceeds from the 2004 and 2005 sales, minus the $25,000 paid to Griffith. Accordingly, Griffith is entitled to disgorgement of $240,574.

### B. Prejudgment Interest

34. Griffith seeks prejudgment interest on the amount of disgorgement. "Because prejudgment interest is a substantive matter, District of Columbia law applies to this issue." *Burlington Ins. Co. v. Okie Dokie, Inc.*, 398 F. Supp. 2d 147, 158 (D.D.C. 2005), *vacated on other grounds*, 439 F. Supp. 2d 124. Even though D.C. law explicitly authorizes prejudgment interest in contract actions pursuant to D.C. Code § 15-109, D.C.

---

[6] While the standard for proving disgorgement set forth in *S.E.C. v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) is derived from an SEC enforcement suit, the court sees no reason why this standard should not apply in the instant case. The court recognizes that, in *First City*, the D.C. Circuit indicated that "in a private action, the party seeking monetary compensation may have a greater burden to prove its claim to the amount requested," 890 F.2d at 1232 n.24. To the extent the burden is greater in a private action, Griffith has met this burden.

law neither authorizes nor forbids the award of prejudgment interest for claims of unjust enrichment. *Cf. Duggan v. Keto*, 554 A.2d 1136, 1140 (D.C. 1989) (stating that, with respect to tort actions, prejudgment interest is neither authorized nor forbidden by statute, and permitting award of prejudgment interest for conversion claim). At least one other court in this district has authorized the award of prejudgment interest under D.C. law for a claim of unjust enrichment, *Burlington Ins. Co.*, 398 F. Supp. 2d at 159,[7] and another has assumed, without deciding, that D.C. law permits an award of prejudgment interest for restitution on a claim of unjust enrichment. *BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil*, 56 F. Supp. 2d 14, 67-68 (D.D.C. 1999), *rev'd on other grounds*, 214 F.3d 168. Furthermore, the D.C. Court of Appeals has indicated that, even when prejudgment interest is not mandatory, the court should award prejudgment interest if necessary to fully compensate an aggrieved party. *Fed. Marketing Co. v. Virginia Impression Prods. Co., Inc.*, 823 A.2d 513, 532 (D.C. 2003) ("the court has ample discretion to include prejudgment interest 'as an element in the damages awarded, if necessary to fully compensate the plaintiff.' The court usually should award such 'delay damages' absent some justification for withholding such an award.") (internal citations omitted).

35. Accordingly, the court concludes that prejudgment interest is appropriate here because prejudgment interest is necessary to fully compensate Griffith. She has been deprived of

---

[7] The award of prejudgment interest was awarded upon a grant of summary judgment, but the court later vacated the grant of summary judgment and consequently vacated the award of prejudgment interest. *Burlington Ins. Co. v. Okie Dokie, Inc.*, 439 F. Supp. 2d 124, 126 (D.D.C. 2006).

the value of the Residence over a period of time, and "[t]he purpose of awarding prejudgment interest as part of the damages for breach of contract is to compensate the creditor for the loss of the use of money over time." *Fed. Marketing Co.,* 823 A.2d at 531; *Dist. Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714, 732 (D.C. 2003) (stating that the purpose of prejudgment interest is to make a party whole); *Dist. of Columbia v. Pierce Assocs., Inc.,* 527 A.2d 306, 311 (D.C. 1987) ("[T]he important question is whether the plaintiff has been deprived of the use of the money withheld and should be compensated for the loss.").

36. Griffith asserts that the rate of prejudgment interest should be set at 6% per D.C. Code § 28-3302, which provides that the rate of interest "upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6% per annum." D.C. Code § 28-3302. There is no reason why this rate should not apply to the instant case. *See Pierce Assocs, Inc.*, 527 A.2d at 311 (holding that the rate of interest in D.C. Code § 28-3302 applies to claims for prejudgment interest on liquidated contract claims). Accordingly, the court sets the rate of prejudgment interest at 6%.

37. Prejudgment interest shall accrue from November 5, 2005, which is the day after the 2005 Sale, to June 11, 2008, which is the date of this Memorandum. Accordingly, Griffith is entitled to $37,505 in prejudgment interest.

### C. Statutory Damages Under TILA and HOEPA

38.  Griffith asserts that she is entitled to statutory damages under TILA and HOEPA based on the Agreement, which was signed in September 2004.[8] The statute of limitations has, however, expired on Griffith's TILA and HOEPA claims. 15 U.S.C. § 1640(e) provides that an action under TILA or HOEPA must be commenced "within one year from the date of the occurrence of the violation." This limitations period is jurisdictional. *Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1039-40 (D.C. Cir. 1986) (finding, in *dicta*, that the limitations period under TILA is jurisdictional). Because federal courts are courts of limited jurisdiction, this court must, *sua sponte*, dismiss the TILA and HOEPA claims as time-barred. *See Hurt v. U.S. Court of Appeals for Dist. of Columbia Cir. Banc*, 2008 WL 441786, at *1 (D.C. Cir. Jan. 24, 2008) (slip copy) (finding that it was proper for the district court to analyze its own jurisdiction *sua sponte* and dismiss the case for lack of jurisdiction); Fed. R. Civ. P. 12(h)(3) ("If the [district] court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action").[9]

---

[8] Griffith concedes that the damages sought under TILA and HOEPA are duplicative of the damages sought via disgorgement. Thus, it is irrelevant whether Griffith is entitled to recover damages under TILA and HOEPA.

[9] Other circuits have held that the statute of limitations is not jurisdictional, and thus is subject to equitable tolling. *See, e.g.*, *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998). Even if the statute of limitations is not jurisdictional, there is no evidence in the record whereby the court could conclude that it has been tolled.

### D.  D.C. Consumer Protection Procedures Act ("CPPA")

39. The CPPA prohibits "improper trade practices." D.C. Code § 28-3901(b)(1). Griffith asserts that defendants violated §§ 28-3904(e) & (f) of the CPPA. Section 28-3904(e) prohibits persons from making "misrepresent[ations] as to a material fact which has a tendency to mislead." Section 28-3904(f) prohibits persons from "fail[ing] to state a material fact if such failure tends to mislead."

40. Defendants violated these sections of the CPPA by, *inter alia*: (1) failing to tell Griffith that she was not required to complete the Agreement and that Griffith could lose her home and any money put into it by not meeting her obligations under the loan; (2) failing to tell Griffith that IREIS had sold the Residence to Brown; (3) failing to tell Griffith that the Residence had then been sold to Davis; (4) misrepresenting the nature and significance of various documents presented to Griffith for her signature; (5) failing to inform Griffith that IREIS intended to use the power of attorney to convey title to the Residence to Brown and Davis; and (6) failing to provide a corrected copy of the Agreement to Griffith, thereby depriving Griffith of any documentation of the Agreement. Accordingly, Griffith has established that defendants are liable under the CPPA.

### E. Punitive Damages Under the CPPA

41. Griffith seeks punitive damages under the CPPA.[10]  D.C. Code § 28-3905(k)(1)(C) provides for the availability of punitive damages under the CPPA.  To recover punitive damages, it is not enough to show that defendants acted with intent.  *Bassin*, 828 A.2d at 726.  Instead, the plaintiff must "prove . . . by clear and convincing evidence that [defendant acted with] . . . a state of mind evincing malice or its equivalent."  *Daka, Inc. v. McCrae*, 839 A.2d 682, 695 n.14 (D.C. 2003).

42. Furthermore, punitive damages can be awarded only if there is a "basis for actual damages."  *Maxwell v. Gallagher*, 709 A.2d 100, 104 (D.C. 1998).  That is to say, there does not need to be an award of actual damages, so long as there is "at least a basis in the evidence for actual – *i.e.,* compensatory – damages before punitive damages may be awarded."  *Jemison v. Nat'l Baptist Convention, U.S.A. Inc.,* 720 A.2d 275, 284 n.7 (D.C. 1998).  For example, in *Dyer v. William S. Bergman & Assocs., Inc.*, 657 A.2d 1132 (D.C. 1995), the D.C. Court of Appeals affirmed an award of punitive damages even though the trial court set aside an award of compensatory damages.  657 A.2d at 1139.  The court found that the trial court did not set aside the compensatory damages award on the basis that plaintiff suffered no injury; rather, the trial court wanted to prevent a double recovery due to a prior arbitration award.  *Id.*  Similarly, while Griffith has not sought an award of actual damages under the CPPA, there is a basis in the record for such an award.

---

[10] It is unclear from Griffith's proposed findings of fact and conclusions of law whether she also seeks punitive damages based on defendants' "fraud, unconscionability, fraudulent conveyance, and unjust enrichment."  Prop. Find. Facts. Conc. Law 16.  The court declines to address the availability of punitive damages under these other theories because the court finds that Griffith is entitled to punitive damages under the CPPA.

43. Accepting the well-pleaded allegations in the complaint as true, Griffith has shown that defendants made misrepresentations and failed to disclose material information. These wrongful acts render Griffith eligible for the statutory damages available under the CPPA, enumerated at D.C. Code § 28-3905(k)(1).

44. Accordingly, Griffith is eligible for punitive damages under the CPPA so long as there is "clear and convincing evidence that [defendant acted with] a state of mind evincing malice or its equivalent." *Daka, Inc.*, 839 A.2d at 695 n.14. That is, Griffith must show that defendant acted with intent, "without justification or excuse, to commit a wrongful act." Black's Law Dictionary (8th ed. 2004) (defining "malice").

45. The court concludes that there is clear and convincing evidence that defendants acted with malice. According to the well-pleaded allegations of the complaint, defendants led Griffith to believe that they would assist her in avoiding foreclosure. Defendants, however, had no intention of doing so. Instead, defendants obtained title to the Residence for a fraction of its value, re-sold it without her knowledge, and extracted significant equity from the Residence. Defendants were aware that Griffith was in a vulnerable position because she was unemployed and in danger of losing her house. In other words, defendants acted with the sole intent of defrauding a vulnerable individual of her title to and value in her house. *See Byrd v. Jackson*, 902 A.2d 778, 782-83 (D.C. 2006) (finding punitive damages appropriate where defendant engaged in foreclosure avoidance scam calculated to take advantage of frail, elderly and vulnerable widow).[11]

---

[11] On pages 15-16 of her proposed findings of fact and conclusions of law, Griffith includes what she asserts is a quote from *Byrd v. Jackson*, 902 A.2d 778 (D.C. 2006). This quote, however, is nowhere to be found in *Byrd*. This quote is, instead, a verbatim excerpt from a Keycite header on Westlaw.

46. The court awards punitive damages in the amount of $100,000.

### F. Injunctive Relief

47. The CPPA provides that this court may enter "an injunction against the use of the unlawful trade practice." D.C. Code § 28-3905(k)(1)(D). Fed. R. Civ. P. 65(d) provides that "[e]very order granting an injunction . . . must . . . state its terms specifically; and . . . describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." In other words, "injunctions issued by federal courts should be narrowly tailored to remedy the harm shown." *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990).

48. The injunctive relief sought by Griffith is extraordinarily broad. In effect, Griffith seeks to prohibit defendants from engaging in any real-estate related transactions. While defendants' actions with respect to Griffith were wrongful, the court has no reason to believe that all of defendants' real-estate transactions are wrongful. Accordingly, the court declines to enter the requested injunctive relief.

Henry H. Kennedy, Jr.
United States District Judge